## SCHWARTZ *vs.* THE STATE.

[INDICTMENT FOR PUBLIC NUISANCE.]

1. *Sufficiency of indictment.*—An indictment under the act of 1858, "to prevent nuisances and illegal trafficking with slaves," (Session Acts, 1857–8, p. 285,) which charges that the defendant ' kept, or was engaged in the keeping of, a public nuisance, by having permitted slaves, or free persons of color, habitually to visit, assemble, stop at, or loiter about, the house or premises kept or occupied by him,"—is sufficient, being in the form authorized by the third section of the act, and is not violative of any constitutional provision.

2. *What constitutes offense.*—To authorize a conviction under this statute, although it is necessary that three respectable witnesses for the State shall testify that the general reputation of the defendant, or that of his house, "as to trading or trafficking *illegally* with slaves," is bad, it is not necessary that the jury should find that fact to be proved; nor is it necessary for the State to prove the defendant's permission or consent that slaves &c. should visit or loiter about his premises ; nor is it necessary that the defendant should be a licensed retailer.

FROM the Circuit Court of Montgomery.

Tried before the Hon. S. D. HALE.

The indictment in this case was founded upon the act of February 6, 1858, entitled "An act to prevent nuisances and illegal trafficking with slaves," which is in the following words :

"SECTION 1. *Be it enacted*," &c., "That the keeping of

every house in this State, where spirituous liquors are sold, retailed, or given away, and which slaves or free persons of color habitually visit, assemble, or stop at, or loiter about, is hereby declared to be-a public nuisance; *provided*, the general reputation of such house, or of the keepers thereof, as to trading or trafficking with slaves, is bad.

"SECTION 2. *Be it further enacted*, That every person who keeps, or engages in the keeping of any such house, shall be liable to indictment therefor, and, upon conviction thereof, shall be fined for the first offense in any sum the jury trying the case may assess, not less than fifty dollars, nor more than two hundred dollars; and for the second, and every subsequent offense, shall be fined not less than two hundred dollars, nor more than one thousand dollars, and be imprisoned in the common jail of the county, not less than ten days, nor more than six months, one or both, in the discretion of the jury trying the offense; *provided*, the person so convicted the second time for the same offense, shall not have license granted him or her again in the same county.

"SECTION 3. *Be it further enacted*, That in all prosecutions under this act, it shall be sufficient for the indictment to state, that the defendant, before the finding of the indictment, kept, or was engaged in the keeping of a public nuisance, by having permitted slaves, or free persons of color, habitually to visit, assemble, or stop at, or loiter about, the house or premises kept or occupied by the defendant.

"SECTION 4. *Be it further enacted*, That before any conviction can be had in any prosecution under this act, it shall be incumbent on the State to prove, by three or more respectable witnesses, that the general reputation of the house, or of the keeper thereof, for the keeping of which the indictment is found, as to trading or trafficking illegally with slaves, is bad."—Session Acts, 1857–8, p. 285.

The indictment charged, "that Peter Schwartz, before the finding of this indictment, kept, or was engaged in the keeping of a public nuisance, by having permitted slaves, or free persons of color, habitually to visit, assemble, stop

at, or loiter about, the house or premises kept or occupied by said defendant; against the peace and dignity," &c. After conviction, the defendant moved in arrest of judgment, "for matters apparent upon the indictment;" but his motion was overruled.

"On the trial," as the bill of exceptions states, "the State gave in evidence, that the defendant kept a grocery-store in the city of Montgomery, on the 1st April, 1858, and had been keeping it since the 6th of February, 1858; and that gangs of negroes, from three to twenty in number, were frequently seen, between those periods, in front of his store, and on the side-walk at the corner of the street where his shop was. One witness testified to the fact, that liquor was kept in the store; but he could not remember having seen any sold there, previous to the finding of the indictment. Another witness testified, that he saw the defendant sell bottles of brandy in January, 1858, but never since. The State also gave in evidence, that the reputation of the house, and of the defendant, for trading with slaves, was bad; five witnesses testified to that fact. The defendant then gave in evidence, that he kept a grocery for the sale of family groceries; and several witnesses testified, that they had bought all their family supplies from him during that period, and visited his store to do so, and never saw a drop of liquor sold by him during that time. Five witnesses testified, that *his* (?) general character of his house, as to trading with slaves, was good; and one witness testified, that he had twice seen the defendant try to drive the negroes away from the corner where his store was, and had heard him say to them, at the same time, that they had no business there. One witness for the defendant testified, that he was a near neighbor of the defendant, and had been living on the square adjoining the defendant for a long time, both before and after the time charged in the indictment, and was well acquainted with him and his neighbors, and knew his general character; but he could not say that he knew his general character, or that of his house, for trading or trafficking illegally with slaves; but he had

heard the neighbors generally repeatedly speak of the defendant, *and never heard a word said by any of them about his trading or trafficking with slaves in any way.* On motion of the State, the court excluded the words" which are italicised; "and the defendant excepted. There was no evidence whether the negroes seen at or near the defendant's shop, as above stated, were slaves or free persons of color; nor were their names given, or any description or identification of them.

" This being all the evidence, the court charged the jury, that if they believed, from the evidence, that the defendant had a house where liquor was sold; and that gangs of negroes had habitually loitered about his premises; and that all the loitering about his premises consisted in negroes being on the public side-walk in the street, and on the corner of the street, where the defendant kept his store; and that the general reputation of the defendant and his house, between the 6th February, 1858, and the finding of the indictment, for trading with slaves, was bad, and had been testified to by three respectable witnesses,— then he was guilty under the indictment.

" The court further charged the jury, that if they believed, from the evidence, that gangs of negroes, from three to twenty in number, had been in the habit of standing about on the side-walk in the street, and at the corner of the street, between the 6th February, 1858, and the finding of the indictment,—then this was such a loitering about the defendant's premises as was contemplated by the statute, even if it had not been established by evidence that it was done by his consent or permission.

" The defendant excepted to each of these charges, and requested the court to instruct the jury, (1st,) 'that unless the negroes who were in the habit of standing on the side-walk at the corner of the street, where the defendant's store was, did so by the consent, permission, or approbation of the defendant, they cannot find him guilty;' (2d,) 'that if the only evidence before them, to establish that the general character of the defendant or his house was

bad, was, that it was bad as to trading with slaves, this is not sufficient, unless they find and believe, from the evidence, that he had traded illegally with slaves.' The court refused both of these charges, and the defendant excepted to their refusal."

Jno. A. Elmore, for the prisoner.

M. A. Baldwin, Attorney-General, *contra.*

STONE, J.—The statute which we are to construe in this case, had for its object the correction of an evil which exists in every slaveholding community, namely, illegal traffick with slaves. The arts and devices of petty traders have generally been such as to elude our penal enactments; and, consequently, slaves have continued to be demoralized, by having held out to them incentives to theft, that they may thereby procure the means of gratifying a corrupted and corrupting appetite. The object of the present enactment was, to reach and prevent the offense, which can rarely be proved because of its secrecy, by seizing upon and punishing another offense against the good government and well-being of slaves, which usually attends upon and evidences the more grievous offense.

The statute, though well conceived to carry out the object of the legislature, is, nevertheless, not expressed with such precision as to leave no doubt or difficulty in its exposition.—See Pamph. Acts, 1857–8, p. 285. The first, third, and fourth sections, are those which create the difficulty. The first section defines the offense; the third relates to the indictment; and the fourth, to the proof. The language of the several sections is variant. Section 1 declares, "that the keeping of every house in this State, where spirituous liquors are sold, retailed, or given away, and which slaves or free persons of color habitually visit, assemble, or stop at, or loiter about, is hereby declared to be a public nuisance; *provided,* the general reputation of such house, or of the keepers thereof, as to trading or trafficking with slaves, is bad." Section 3 provides, "that

in all prosecutions under this act, it shall be sufficient for the indictment to state, that the defendant, before the finding of the indictment, kept, or was engaged in the keeping of a public nuisance, by having permitted slaves or free persons of color habitually to visit, assemble, or stop at, or loiter about, the house or premises kept or occupied by the defendant."

The indictment in this case pursues section 3, and contains nothing beyond its specified requirements. It is urged for the defendant, that this indictment does not conform to the bill of rights, because it fails to set forth "the nature and cause of the accusation."—Bill of rights, § 10 ; Code, p. 30. A further objection urged against it is, that it is not framed according to the forms which the law has prescribed. We have duly considered these objections, and it is our opinion that they are not well taken.

This statute is a public one, and all men are charged with a knowledge of its contents.—*Erwin v. Hamner*, 27 Ala. 296. All men, in reading an indictment framed under the third section, are reasonably informed that the indictment charges the offense denounced by the first section. In fact, it may admit of question, if such is not the result of the legal intendment, which presumes that every one knows the law. Be this as it may, enough is stated in the indictment to inform the defendant of the nature and cause of the accusation. The non-professional reader will be better informed of the nature and cause of the accusation by the simple statement found in this record, than he would be by the technical verbosity which prevailed a century ago.

Nor is this a new question in this court. Several of the Code forms of indictments are defective, under the argument made in this case ; for they omit to aver many facts, which are necessary to be proved to insure a conviction. Many of them aver facts disjunctively, and all of them omit all mention of the county in which the offense was committed.—See Code, §§ 3244, 3506, 3507 ; also, forms Nos. 7, 26, 29, 31, 33, 66, 67, 68, 71, 74, &c. These forms
30

we have invariably held sufficient.—See the authorities collected, Shep. Dig. 71–2. In *Noles v. The State*, (24 Ala. 672,) our predecessors ruled, that the constitution does not inhibit the legislature from introducing forms of indicment, variant from those of the common law. They further ruled, that, if the form of indictment prescribed by the statute contain such an accusation at the suit of the State, found by a grand jury, as furnishes to the accused reasonable information of what he is called on to answer, by setting forth the constituent elements of the offense, it will be sufficient, although it may omit many averments that were necessary at common law. The indictment in this case is in the form which the law has prescribed, and, under the rules above declared, it is sufficient.

The fourth section of the act under which the defendant was tried, is in the following language : "Before any conviction can be had in any prosecution under this act, it shall be incumbent on the State to prove, by three or more respectable witnesses, that the general reputation of the house, or the keeper thereof, for the keeping of which the indictment is found, as to trading or trafficking illegally with slaves, is bad." On a comparison of the sections 1, 3, and 4 of this statute, it will be discovered that each is different from the others. Section 1 declares, that certain elements shall constitute a public nuisance; section 3 relates to the indictment; and section 4 declares, that certain proof shall be made before a conviction can be had. Section 3 omits all mention of many of the ingredients of the offense, as found in section 1; while section 4, in speaking of the proof to be made, contains the word *illegally*, which is not found in section 1. Now, we think these difficulties vanish, when we consider the purpose for which each separate section appears to have been inserted. Section 1 defines the offense, and its constituent elements; section 3 declares what shall be a sufficient indictment; and section 4 requires, that certain proof shall be made, preliminary to a conviction. The first declares what shall be found by the jury; the third, what shall be alleged by

the pleader ; and the fourth, what shall be deposed to by three or more respectable witnesses. To allow section 4, which relates to the testimony, to enlarge the constituent elements of the offense which section 1 defines, would seem to be as illogical, as to allow section 3, which defines the indictment, to restrict those constituent elements.

If it be asked, why require the witnesses to testify that the character for trafficking *illegally* with slaves is bad, if that be not one of the facts to be found by the jury ;—we answer, it was certainly within the power of the legislature to make such a rule, and it is not for us to question the exercise of that power. The offense is complete, under section 1, if only *free persons of color* habitually visit, assemble, or stop at, or loiter about, a house of the kind mentioned in the statute, provided the general reputation of such house or the keeper thereof, as to trading or trafficking with slaves, is bad. It is not complete, if *slaves* habitually visit, assemble, &c., at such house, unless the reputation of the house or its keeper, for trading or trafficking with slaves, is bad.

In *Jordan v. Owen*, (27 Ala. 152,) we decided, that a plaintiff, testifying in his own case to an indebtedness to him, must go farther, and swear that the debt is unpaid. Yet no one would contend, that, in such case, the charge of the court should authorize that body to find against the plaintiff, if he had not satisfied them that the debt was not paid. The proof, in such case, getting before the jury, if the plaintiff make out a *prima-facie* case of indebtedness, the *onus* of showing a payment would, in the case supposed, as in all other cases, rest on the defendant. *Ei incumbit probatio, qui dicit.* The testimony in such case, to be legal, must contain positive and negative averments ; while the finding of the jury need only respond affirmatively.

A fair illustration of the argument we are making, may be seen in the following supposed case. It is said to be a rule of the common law, not to convict of murder, unless the dead body has been found. Now, suppose an act of

the legislature should declare, that no conviction for mur-
der should be had, unless three respectable witnesses should
testify that they had seen the dead body.   On a trial, three
respectable witnesses testify as the statute requires; but
the jury are convinced that one of the witnesses is mis-
taken, and that in fact he never saw the dead body.   Still
the jury are convinced, beyond reasonable doubt, that the
prisoner had committed the offense charged.   Would any
one contend, that, under the influence of such supposed
statute, the prisoner should be acquitted ?   So, under this
statute, we hold, that section 4 is not introductive of any
new fact to be found by the jury; but that, out of abun-
dant caution, its purpose was to screen the defendant from
conviction, save on the testimony of three or more respect-
able witnesses on the question of character.

It may be questioned, whether there can be such thing
as general bad character or reputation for trading or traffick-
ing with slaves, unless such trading or trafficking was
illegal ;' in other words, that a trader, who dealt with
slaves legally, could not thereby acquire a bad reputation.
In answer to this we say, the legislature have inserted the
word *illegally*, in defining the measure of proof, and we
prefer not to say they had no object in doing so.   We
hold, then, that the testimony must conform to section
four, but the finding need only respond to the requirements
of section one.

The bill of exceptions in this case purports to set out all
the evidence.   Five witnesses testified, that the general re-
putation of the defendant, for trading or trafficking with
slaves, was bad ; but no witness employed the word *ille-
gally*.   In the first charge given to the jury, the circuit
court, on this point, said, in effect, that if three respecta-
ble witnesses had testified that the defendant's general
reputation for trading or trafficking with slaves was bad,
this would meet the requirements of the law.   This was
an error.

The second charge is, perhaps, obnoxious to criticism, in
this—that it does not sufficiently confine the assembling

or loitering of the slaves, or free persons of color, to a place or places *at* or *about* the premises of the defendant. This will be remedied on another trial.

It was not necessary that the State should prove affirmatively, that the defendant permitted, or consented, that slaves should *visit, stop, or assemble at, or loiter about* his premises. The police of his own premises was under his control, and it was both his privilege and duty to drive them away. If he did not do so, that provision of the statute was violated.

It was not necessary that the defendant should have been a licensed retailer. If he kept a house where spirituous liquors were *sold, retailed,* or *given away*, that was sufficient. The phrase, "shall not have a license granted to him or her again," is a verbal inaccuracy. Its meaning is *afterwards*, as is shown by other provisions of the statute.

What we have said will sufficiently guide the circuit court in another trial.

Reversed and remanded.