141 So. 215

## WEEMS et al. v. STATE.
### 8 Div. 321.

Supreme Court of Alabama.
March 24, 1932.

Rehearing Denied April 9, 1932.

George W. Chamlee, Sr., and George W. Chamlee, Jr., both of Chattanooga, Tenn., and Joseph R. Brodsky, Irving Schwab, Allan Taub, Elias M. Schwartzbart, Joseph Tauber and Sidney Schreiber, all of New York City, for appellants.

Thos. E. Knight, Jr., Atty. Gen., and Thos. Seay Lawson, Asst. Atty. Gen., for the State.

**THOMAS, J.**

The record in this case, No. 2402 in the circuit court, shows that on the 31st day of March, 1931, the defendants. appellants here, appeared in person and by their counsel, and were duly arraigned, and entered a plea of not guilty; that the case was thereupon set for trial along with case No. 2404, State of Alabama v. Haywood Patterson, who was also jointly indicted with the appellants in this case; was set to be tried on Monday, April 6th; that the court ordered that the venire for the trial should consist of one hundred jurors, including the regular jurors drawn for the week in which this case was set for trial, and twenty-five jurors specially drawn from the jury box in open court in the presence of the defendants and their counsel; that all of said jurors be summoned by the sheriff, and a list thereof be made, and, together with a copy of the indictment, be served on each of the defendants. The record further shows that this order was complied with, and that such list, together with a copy of the indictment, was served on each of the defendants. This was in strict compliance with the statutes. Code 1923, §§ 8644, 8649. See Patterson v. State (Ala. Sup.) 141 So. 195,[1] and Powell et al. v. State (Ala. Sup.) 141 So. 201,[2] as to venire and setting of the causes for trial. Whitehead v. State, 206 Ala. 288, 90 So. 351.

The motion for change of venue made in this case, and the evidence in support thereof, are identical with the motion and evidence made in the case of State v. Haywood Patterson. No. 2404, which has been fully considered in Patterson's appeal, argued and submitted along with this appeal, and what was said in that case will not be repeated here, as we are in accord with Justices Brown's and Knight's opinions of the facts on this motion and under the authorities cited and adverted to in the opinions in Patterson v. State and Powell et al. v. State, supra. The motion was denied without error. Patterson v. State (Ala. Sup.) 141 So. 195; [1] Malloy v. State, 209 Ala. 219, 96 So. 57; Riley v. State, 209 Ala. 505, 96 So. 599; Godau v. State, 179 Ala. 27, 60 So. 908.

[1] Post, p. 531.
[2] Post, p. 540.

The indictment was in the form prescribed by the statute (Code 1923, § 4556, form 88), and under the repeated decisions of this court was sufficient to advise the appellants of the nature and cause of the accusation, and appellants had a copy thereof. This met the requirements of the Constitution. Malloy v. State, supra; Schwartz v. State, 37 Ala. 460; Doss v. State, 220 Ala. 30, 32, 123 So. 231, 68 A. L. R. 712; Jinright v. State, 220 Ala. 268, 125 So. 606; Myers et al. v. State, 84 Ala. 11, 4 So. 291; McQuirk v. State, 84 Ala. 435, 4 So. 775, 5 Am. St. Rep. 381. The many authorities on this point are collected in 69 A. L. R. 1392, note.

The evidence of the state's witness Victoria Price, to state its substance, goes to show that on the 25th day of March, 1931, she was riding on a freight train through Jackson county with her girl companion, Ruby Bates; that they were riding in a "gondola car" loaded with chert or gravel; that just after the train passed Stevenson in Jackson county, Ala., the appellants, Charlie Weems and Clarence Norris, with the aid of other negroes, forcibly stripped off her outer garment, a pair of overalls, tore off her under garments, and forcibly ravished her; that there were twelve in the party of negroes who came upon the car and forced six of seven white boys to leave the train while it was in fast motion, by assaulting said white boys; that, after said white boys were forced to leave the train, some of the negroes raped her companion, Ruby Bates, and the others raped her—six in number—and that some of them held the girls while the others accomplished their purpose; that Weems held a knife against the throat of witness, while some of the others, including Norris, forcibly had sexual intercourse with her.

On cross-examination, after this witness testified that she was married, and had not been divorced, she was asked by defendants' counsel: "Did you leave him (her husband) at Huntsville?" The court sustained the solicitor's objection to the question, and defendants excepted. This question called for immaterial testimony, and the objection was properly sustained. She was also asked by defendants' counsel: "How long had you known your husband before you married him?" And due objection was sustained. This likewise called for immaterial testimony, and the objection was properly sustained. The same is true as to the question, "Were you ever in jail before?"

Dr. Bridges, whose qualification as a medical witness was conceded by the defendants' counsel, testified that he, with Dr. Lynch, the county health officer, made a physical examination of the witnesses Victoria Price and Ruby Bates on the afternoon of the alleged rape, and found bruises and

scratches on their persons, but no lacerations or tears of the sexual organs, and testified to the presence in the vaginas of the two witnesses of the male germ, going to show penetration; and expressed his judgment, as a physician, that "six men, one right after the other, could have had intercourse with her (Victoria Price) without lacerations. That is possible." This opinion evidence was competent.

■ On cross-examination of this witness, the defendants' counsel asked him: "Both of these girls admitted to you they had had sexual intercourse previous to this, didn't they?" Due objection was made to this question, which was sustained. There was no evidence showing or tending to show that the defendants had sexual intercourse by and with the consent of the state's witnesses. The evidence sought was not material. Patterson v. State, 141 So. 195; [1] Powell et al. v. State, 141 So. 201; [2] Griffin v. State, 155 Ala. 88, 46 So. 481; Rice v. State of Florida, 35 Fla. 236, 17 So. 286, 48 Am. St. Rep. 245; Story v. State, 178 Ala. 98, 59 So. 480. See, also, Bailey v. Com., 82 Va. 107, 3 Am. St. Rep. 87; 22 R. C. L. p. 1208, § 42; 52 C. J. 1079, § 109.

■■ The same is true as to the following questions to this witness: "Both of them told you they had had sexual intercourse, one told you she had been married and the other told you she had been—" "* * * From your examination could you tell whether or not they were subject to intercourse? Were they virgins? * * *" "That you find anything in the vagina that indicated to you these girls had had or might have had gonorrhea or syphilis?" And other questions of like import. The latter question was not pertinent as to identity or the corpus delicti of the immediate offense, as was the case in Williams v. State, ante, p. 6, 138 So. 291. These inquiries were beyond the controverted issues of fact being tried.

■ Tom Taylor Rousseau testified as a witness for the state, identified the appellants as being among those taken from the train at Paint Rock—from the gondola car —also testified that he did not see the girls when they got off the train, and further testified: "I saw Victoria Price a little later. When I saw her at that time they were coming around the depot with her in a chair. She had her eyes closed and was lying over this way and they were bringing her from the depot up to town to the doctor's office. That was Victoria Price. I saw her later one time from where I was. She was still in the chair." This witness testified on cross-examination, among other things, that: "One of the girls was not in condition to walk. I did not help carry her off. There was an

officer toted (carried) the girl up there. They toted (carried) her off the train, a fellow named M. A. Mize. He had to carry her away from the train, unconscious. I don't know about what the doctor said about her being unconscious at that time. I was not there. I was there at the time the girl was taken off."

At this juncture, defendants' counsel asked the witness: "And if he (the doctor) testified immediately after their arrival here or at Paint Rock she was not unconscious, he is mistaken about it?" The objection to this question was properly sustained. It was the province of the jury, not the witness, to say which of the two versions was true. Moreover, the question related, not only to the condition of Mrs. Price at Paint Rock, but also at Scottsboro, and this witness had not testified to her condition at Scottsboro.

Jim Broadway testified, as a witness for the state, that he was present at Paint Rock when Victoria Price and her companion left the train, and further: "I saw Victoria Price there. We got her off the freight train. She was on one of these gravel cars. That is known as a gondola car. There was another woman with her, the Bates girl. The Bates girl seemed to be in fairly good shape, but the other could not hardly talk and couldn't walk."

■ The state's solicitor here asked the witness: "Did you hear them make any complaint there, either one of these girls, of the treatment they had received at the hands of these negroes?" The defendants severally objected to this question on the ground that it called for incompetent, irrelevant, immaterial, and illegal testimony, and for hearsay testimony. The court ruled that the answer be limited to Victoria Price, the person named in the indictment as the victim, and the defendants again objected on the same ground. The objection being overruled, the witness answered: "I did not hear Victoria Price make any complaint, either to me or anybody else there, about the treatment she had received at the hands of these defendants over there. We sent and got a chair for Victoria Price and carried her to the doctor's office at Paint Rock."

The courts are unanimous in holding on a trial for rape and assault with intent to ravish, that it is permissible to show that the alleged victim made complaint of the outrage soon after its commission, as a circumstance to corroborate her testimony. Barnes v. State, 88 Ala. 204, 7 So. 38, 16 Am. St. Rep. 48, and note; 22 R. C. L. 1212, § 47. The defendants' objection was, therefore, overruled without error.

Ruby Bates, the companion of Victoria Price, over defendants' objection, was allowed by the court to testify that the de-

---

[1] Post, p. 531.
[2] Post, p. 540.

fendants were among those on the train; that they, with the others, came over the box car in a body and into the gondola car where the witness and her woman companion were riding, armed with pistols and knives, and assaulted the white boys and forced them to leave the train, and then seized the witness and her companion and threw them down in the car.

On cross-examination this witness testified: "I have never been married. I had a conversation with the doctor about having sexual intercourse. I am talking about the doctor after I arrived at Scottsboro, I do not remember his name. * * * I just told him to examine me and see if he could find anything wrong with me. I told him about those negroes." Counsel for the defendants thereupon asked the witness: "No, not about the negroes, but did you tell him you had had intercourse before?" The court sustained the solicitor's objection to this question, and, for reasons heretofore stated, this ruling was not error.

This witness further testified on cross-examination: "I had not said a word to these white boys when I saw the negroes coming over. Nothing had been said between either me or my companion to the white boys. They were in one end of the car and we were in the other, sitting perfectly quiet, no sort of conversation, just sat there looking at each other. When I saw the negroes coming one of these white boys looked up over the car and said: 'Look coming yonder,' and we all looked up then, and they told the white boys to unload and the white boys still hadn't said nothing to us. There was one white boy out of seven left on the train. I do not (know) the names of any of the white boys. I could not tell you why they left this one. He stayed on in that gondola car. The negroes hit him but they did not put him off." Defendants' counsel then asked the witness: "They could have put him off just like they did the rest of them; there wasn't any reason for not putting him off, was there?"

This question called for a conclusion, and, if it was at all material, the jury, under the facts developed, could draw the conclusion or inference.

The further testimony of this witness fully corroborated the witness Victoria Price, going to show that these girls were forcibly ravished.

Luther Morris, who was, at the time the train passed, between Scottsboro and Stevenson, at his home, testified, in behalf of the state, that he observed the freight train passing. "I saw a bunch of negroes put off five white men and take charge of two girls. I saw between eight and ten negroes, and they put five white men off the train, made

them get off the train. They did not throw them off; they just overpowered them and made them get off. * * * I did not hear any pistol shots. The train was making so much racket I could not hear. I figure that the train was making between thirty-five and forty miles an hour. I saw those white men get off or fall off the train. I guess I observed that and could see that train there for about four hundred yards. I was there in thirty yards of the track. The kind of car on the train they were getting off was a coal car, or gravel car, you might call it."

On cross-examination this witness testified: "I saw two women in the gondola, two white girls. The two white girls were doing their best to jump, and the negroes caught these two white girls and they were pulled back down in the car. I was standing above this train so I could get a good view. I saw all of this going on. * * * I went out to where these boys were, the two that got knocked in the head, but they were hurting so bad they could not talk. They just said: 'I am dying.' I certainly did notice wounds or bruises about them."

The state offered two more witnesses, who observed the train as it passed and saw some of the crowd on the train, and afterwards saw the white boys after they were forced off the train.

The defendant Weems testified, inter alia: "My name is Charley Weems. I was on this freight train running between Stevenson and Paint Rock on March 25th. There were twelve of us negro boys on that train. There were seven white boys on there. I first seen the white boys when we left Chattanooga. I did not see the girls on the train till we got to Paint Rock. I got on the side of a box car at Chattanooga and crawled over to an oil tank. When the train slowed up at Main Street I came across the box car to the oil tank. When we got up to that next little town above Chattanooga, I left the oil tank and went to the gondola. I don't know what town it was. I had been out of Chattanooga about an hour or a little over. The fight between the white boys and the negroes started down here at Stevenson, after we left Stevenson. The white boys were in the gondola. The negroes got in the gondola directly after we left Stevenson. Haywood Patterson and that long yellow boy back there first went in the gondola. Three of us went over in the gondola. What prompted me to go in the gondola, Haywood Patterson had a pistol and he said 'Come on and help me get the white boys off; if you don't I am going to shoot you off.' I don't know whether any of the negroes had been quarreling. They were not on the train where I was. I was one of the three boys that went in the gondola first. I was behind Haywood Patterson. Haywood Patterson just walked up and hit this white

fellow over the head with a pistol. I was not doing anything at all. I didn't have a pocket knife or nothing. I just told the white boys to get off. A fight did not start. These white boys did not fight at all; they just run and tried to get off the train. About five got off the train. I could not tell how many stayed on the train. Some of them went off toward the engine. I don't know where the girls were. I did not see the girls. I never did see the girls. I got off the train when we got to Paint Rock. I got off the train. Five boys got off the train in all. The five were me and Clarence Norris, Ozie Powell, Willie Roberson and that boy back there, Olen Montgomery, that blind boy. I had known these negroes that were with me since we left Atlanta; we left Atlanta together. I did not know the rest until we got on the road. The first time I saw these girls was when we got to Paint Rock. They were getting off the train. They got off the gondola. I wasn't in the gondola they were on. I wasn't in that gondola at all. I had not been in that particular car, not where they were. I did not see the girls until they were getting off the gondola. I don't know how many gondolas were on that train; five or six on that train along in line together; some were, and some on the other side of box cars; a box car was between them. I had nothing to do with the girls at all. If anybody had anything to do with the girls I don't know nothing about it. * * * I wasn't on a gondola. I was on an oil tank. I got over in the gondola down at Stevenson. I walked over the top of the gondola. Some white fellows were in the gondola. There was gravel in that gondola. These white boys were in the car when I got in it at Stevenson. I did not jump off the box car into the gondola. I climbed down and stepped in. The car had steps on the end of it. Haywood Patterson told me to go in there and help throw them white fellows off; if I didn't he was going to shoot me off. That is Patterson (indicating). He told me why he wanted me to go along. He wanted to go in there and help throw the white fellows off. He said he was throwing them off because they had been trying to run over him down in the oil tank. Haywood Patterson had a pistol. I did not have a pistol. I saw his pistol. He went back along the train to call me to help throw the boys off. There were seven white boys on the train. We had come to Stevenson from Chattanooga before we got in there. I could not see all over the gondola and there could not have been anybody hid in there where I could not have seen them. I did not see those two girls in there. The boys were lying right in the center of the gondola car. I did not see the girls at no time until I got to Paint Rock. Five boys were put off. Haywood Patterson hit one; I don't know his name, but he had on a big wide belt, and he hit him across the head with a pistol. When he hit him he did not catch hold of him. He didn't grab him. This white fellow just jumped off and said 'Yes, we will get off.' He did not fight, because the white fellow got scared of the pistol and climbed down on the side of the car and jumped off. The other fellow jumped off. They all jumped off but one. One little white boy stayed in the car and Patterson said to put him off and he done put his foot down on the side and another boy had a big knife around his throat. He did not jump off. He begged for mercy and I reached down and pulled him back on the box car. I never saw these girls at all and never had anything to do with them; never had my hands on them. I could tell the girls from the boys. Just because they had on overalls it wouldn't change their looks with me. There wasn't a soul in that car with me and Patterson except these negroes and one white boy. * * * We were all in the gondola when we got to Paint Rock. I never saw no girls in this gondola we were in at all. I first saw the girls when they came toting them through Paint Rock. They had the oldest girl in a chair coming through Paint Rock. She did not get out of the gondola I got out of. I don't know whether she got out of a gondola or not. The first I saw of either one of the girls they were bringing the oldest girl up in a chair."

The defendant Norris testified, among other things: "I was not in the gondola when this fight occurred. I seen two boys on the flat where I was on the cross-ties. I did not have any trouble with them. I did not have a pistol or a knife. I did not leave that car I was riding on. I did not leave it at Paint Rock. I don't know who took me off the train at Paint Rock, there were so many there. I remember getting off. I got off at Paint Rock, I reckon. I did not just leave the train. They threw guns on me, the officers did. I had not been engaged in the fight at all but I seen the fight. The fight took place in the gondola car. Every one of them colored boys was fighting. They were all fighting. That one yonder, Haywood Patterson started the fight. He came across the flat car where I was on the cross-ties; him and the rest of them colored boys come across that car and said he was going over there to run the white boys off and going to have something to do with them white girls. I saw this boy that just testified before me on the stand. They came across where I was sitting down at that time. They knew the girls were on the train and the white boys with the girls on the gondola car. I had not seen the girls. I hadn't seen them till I got off this flat car I was sitting in, and seen these boys fall off the train; after he said he was going to run them off I seen them fall off the train and I asked two white boys what they were getting off the train for and he told me he did not know, and I got up on the train to see if he was putting them

off, and sure enough I got up on the box car and looked where they were and the whole crowd was putting the white boys off. One had a knife around the other's neck and trying to push him off, and he wouldn't get off and the other boy took him and pulled him back up in the car. I did not have anything to do with the girls. I did not have my hands on any of them. I did not hold them or anything of that sort. When I first saw the girls the train was away up the road. When I saw the girls was when I got up on the box car and looked over where he was putting the white boys off. * * * I did not get into that gondola at all. I just looked in. This Weems I was speaking about here is not my friend. I knew him. I saw him over in the gondola and I saw the girls in there, but I did not go in there. I saw that negro in there with those girls. I seen everyone of them have something to do with those girls after they put the white boys off the train. After they put the white boys off I was sitting up on the box car and I saw every one have something to do with those girls. I was sitting on top of the box car. I saw that negro just on the stand, Weems, rape one of those girls. I saw that myself. When the officers searched me they did not find anything on me. They did not find a pearl-handled knife. They did not find a pearl-handled knife on me. I did not have a knife or pistol. I did not go down in the car and I did not have my hands on the girls at all, but I saw that one rape her. They all raped her, every one of them. There wasn't any one holding the girls legs when Weems raped· her, as far as I saw. The other boy sitting yonder had a knife around her throat, that one sitting on the end behind the little boy. I don't know what his name is, but he is the one that had the knife. I did not see the little one hold of her legs while this one was raping her. I did not see anybody holding her legs. I don't know who pulled off her overalls. The girls were lying down when I got up on the box car. This big one did not have a knife on her throat. That little boy sitting behind yonder—I don't know his name—is the one that had a knife around her neck, making her lie down while the others raped her. I didn't see any of the negroes take her overalls off. The girls were lying down when I got up on the box car. I saw the overalls lying in the car. I did not see any step-ins. I did not get down in the gondola, never did get down in there."

The state offered evidence in rebuttal going to show that the officers, when they arrested Norris, took off his person a knife, which was identified by the witness Victoria Price as her knife, and testified that Norris took the knife from her as well as all the money she had—$1.50.

Appellants' insistence that the evidence does not support the verdict of guilty, as charged in the indictment, cannot be sustained. The evidence, much of which has been set out above, proves the body of the crime, without dispute, and strongly tends to establish a conspiracy between those who forced the white boys to leave the train, to do the unlawful acts which immediately followed, and that they all aided and abetted therein. 22 R. C. L. 1176, § 6; State v. Burns, 82 Conn. 213, 72 A. 1083, 16 Ann. Cas. 465; State ex rel. Attorney-General v. Tally, Judge, etc., 102 Ala. 25, 15 So. 722.

There is no contention on the part of the defendants, that they had sexual intercourse with the alleged victim by and with her consent, express or implied, and no evidence was adduced to support such contention; therefore evidence alleged to have been newly discovered was not such as would authorize the granting· of a new trial. Patterson v. State, supra; Fries v. Acme White Lead & Color Works, 201 Ala. 613, 79 So. 45. There was no error in overruling the motion for a new trial. Patterson v. State, supra.

The record shows that the defendants were represented by counsel who thoroughly cross-examined the state's witnesses, and presented such· evidence as was available in their behalf, and no reason appears why the judgment should not be affirmed.

Other questions presented on motion for a new trial were fully considered in the Patterson and Powell Cases, which are here approved, and need not be repeated. There is no reversible error. The judgment of the lower court is therefore affirmed as to each of the defendants, Charlie Weems, alias, etc., and Clarence Norris, alias, etc.

Affirmed.

GARDNER, BOULDIN, BROWN, FOSTER, and KNIGHT, JJ., concur.

ANDERSON, C. J., dissents.