ATKINSON *v.* STATE.*

(Division B.  Sept. 29, 1924.  Suggestion of Error Overruled Oct. 27, 1924.)  .

[101 So. 490.  No. 23953.]

1  GRAND JURY.  *Venire not quashed for failure to select jurors from*
'     *each supervisor's district, unless showing that grand jury par-*
      *tial.*

   Where the board of supervisors fails to select the jurors from each supervisor's district, in proportion to the number of qualified persons in the districts, a motion to quash the venire should be overruled where there is no testimony to show that the grand jury was not composed of fair and impartial men otherwise qualified to act as grand jurors; because section 2718, Code of 1906 (section 2211, Hemingway's Code), provides that all of the provisions of law in relation to the listing, drawing, summoning, and impaneling of juries are directory merely.

2.  CRIMINAL LAW.  *Instruction omitting essential elements of murder*
      *held harmless, in view of previous instruction setting out stat-*
      *utory definition.*  .

   Where the testimony of the state sustains the theory that the appellant is guilty of murder, while that of the defendant sustains the theory that the killing was in necessary self-defense, an instruction authorizing the jury to find the appellant guilty of murder which omits the fact that the offense was committed with malice aforethought, or which the deliberate design to effect the death of the one killed, and not in necessary self-defense, and where a previous instruction for the state gave the statutory definition of murder, the instruction so given was erroneous but harmless error.

3.  HOMICIDE.  *Homicide not reduced to manslaughter because deceased*
      *trespasser.*

   .  A homicide which would otherwise be murder is not reduced to manslaughter by virtue of sections 1132 and 1137, Hemingway's

Code (sections 1389 and 1394, Code of 1906), where the testimony does not show first that the one killed had been told by the defendant to keep off his premises or had not received a message to this effect from the defendant, and where the testimony fails to show that the lands upon which the shooting occurred were inclosed or within a stock-law district in accordance with the provisions of section 1137, *supra.*

---

*Headnotes 1.  Grand Juries, 28 C. J., section 34;  2.  Criminal Law, 16 C. J., section 2495;  3.  Homicide, 30 C. J., section 659.

APPEAL from circuit court of Leake county.
HON. G. E. WILSON, Judge.
Will Atkinson was convicted of murder, and he appeals.  Affirmed.

*Jas. T. Crawley* and *D. H. Glass,* for appellant.

*R. H. Knox,* Attorney-General and *J. A. Teat,* for the state.

Briefs in this case not available to the Reporter.

Argued orally by *David H. Glass,* and *Jas. T. Crawley,* for appellant, and *J. A. Teat,* for state.

SYKES, P. J., delivered the opinion of the court.

The appellant, Will Atkinson, and Jeff Atkinson were indicted by the grand jury of Leake county for the murder of one Joseph Owen.  A severance was granted, and Will Atkinson was tried and convicted and sentenced to the penitentiary for life, from which judgment this appeal is here prosecuted.

Appellant had previously been indicted, tried, and convicted in the first district of Hinds county of this offense, which judgment was upon appeal to this court reversed.  For the questions involved on this appeal reference is made to *Atkinson* v. *State,* 132, Miss. 377, 96 So. 310.

The day of the convening of the circuit court in Leake county, and before any of the grand jurors were called, the appellant filed a motion to quash the jury list. The grounds alleged in this motion are that the jury list and boxes had been prepared by the board of supervisors of the county, in violation of section 2180, Hemingway's Code (section 2688, Code of 1906). This section reads as follows:

"The board of supervisors, at the first meeting in each year, or at a subsequent meeting if not done at the first meeting, shall select and make a list of persons to serve as jurors in the circuit court for the twelve months beginning more than thirty days afterward, and as a guide in making the list they shall use the registration book of voters, and shall select and list the names of qualified persons of good intelligence, sounds judgment, and fair character, and shall take them as nearly as they conveniently can, from the several supervisor's districts in proportion to the number of qualified persons in each, excluding all who have served on the regular panel within two years, if there be not a deficiency of jurors. Said clerk shall put the names from each supervisor's district in a separate box or compartment, kept for the purpose, which shall be locked and kept closed and sealed, except when juries are drawn, when the names shall be drawn for each box in regular order, until a sufficient number is drawn. The board of supervisors shall cause the jury box to be emptied of all names therein, and the same to be refilled from the jury list as made by them at said meeting. If the jury box shall at any time be so exhausted of names as that a jury cannot be drawn as provides by law, then the board of supervisors may at any regular meeting make a new list of jurors in the manner herein provided."

It was agreed by the attorneys representing the state and the defendant that the jury list was selected and drawn as follows:

|  | No. of Qualified Persons in Beat. | No. Placed in Jury Box. |
|---|---|---|
| District No. 1 ..................... | 1,001 | 75 |
| District No. 2 ..................... | 985 | 54 |
| District No. 3 ..................... | 311 | 43 |
| District No. 4 ..................... | 568 | 59 |
| District No. 5 ..................... | 1,318 | 50 |

The clerk of the board of supervisors in effect testified that, while the board of supervisors was familiar with the fact that the jury list should be proportioned according to the number of qualified persons in the several supervisor's districts, there had been some criticism against the member of the board from district three for allowing the names in the jury box from his district to become exhausted, and for this reason the jury· was drawn by them as above shown.

A mere glance at the number of jurors, selected from each supervisor's district shows that the board of supervisors failed to select these names ''in proportion to the number of qualified persons in each'' district. Neither can it be said that there was a substantial compliance with this law. It is not contended that there was any fraudulent or corrupt motive on the part of the members of the board of supervisors. Neither is it contended that the grand jury was not composed of men who were qualified electors, of good intelligence, sound judgment, and fair character, and that the grand jury did not perform honestly and conscientiously its duties. In their able brief counsel for appellants rely upon the cases of *Purvis* v. *State,* 71 Miss. 706, 16 So. 268; *Litford* v. *State,* 93 Miss. 420, 46 So. 246; *McQuillen* v. *State,* 8 Smedes & M. 587; *Stokes* v. *State,* 24 Miss. 621; *Shepherd* v. *State,* 89 Miss. 154, 42 So. 544, 10 Ann. Cas. 963; *Cook* v. *State,* 90 Miss. 137, 43 So. 618. An examination of these cases lends weight to the forceful argument of the appellant. The rules, however, therein announced

have been modified and qualified by later decisions of this court, and we are constrained to follow these last pronouncements.

Section 2718, Code of 1906 (section 2211, Hemingway's Code), is as follows:

"All the provisions of law in relation to the listing, drawing, summoning and impaneling juries are directory merely; and a jury listed, drawn, summoned or impaneled, though in an informal or irregular manner, shall be deemed a legal jury after it shall have been impaneled and sworn; and shall have the power to perform all the duties devolving on the jury."

In the case of *Ferguson* v. *State,* 107 Miss. 559, 65 So. 584, it is said that:

"Since there is no evidence that appellant was not tried by a fair and impartial jury, error cannot be predicated of an irregularity in the drawing or impaneling thereof, since the statutes on the subject are declared, by section 2718 of the Code of 1906, to be directory merely."

A case very much in point is that of *Simmons* v. *State,* 109 Miss. 605, 68 So. 913. In that case there was a motion to quash the venire because the minutes of the board of supervisors showed that all of the names were drawn from one district of Lincoln county. In passing upon the failure to comply with this section of the Code, the court in its opinion said:

"But, conceding that the list of jurors was made up altogether from residents of beat 1, we are constrained to hold that the verdict and judgment of conviction must be upheld, in the absence of a showing on the part of the appellant that he has been materially hurt, damaged, or prejudiced in any of his rights. The twelve men impaneled were admittedly qualified jurors, fair and impartial in this particular case. . . . Section 2718 of the Code provides that our jury laws are directory, and

this section, in the absence of a showing that appellant has in fact been injured by the overruling of the motion to quash the venire, cures any alleged error of the board of supervisors or the court below in the 'listing, drawing, summoning, and impaneling of the jury in question.' "

This opinion then goes on to discuss a number of the cases relied on in the present case by the appellant.

In the Simmons case there was a greater departure from this law than in the case at bar, because there all of the jurors were drawn from one district, while here the jurors were drawn from all of the districts, but they were not properly drawn in accordance with the number of qualified jurors of each district. The case of *McVey* v. *State,* 117 Miss. 243, 78 So. 150, is also in point. To the same effect are the opinions of the court in the cases of *Haney* v. *State,* 129 Miss. 486, 92 So. 627, and *Quick* v. *State,* 132 Miss. 794, 96 So. 737.

The court was correct in overruling this motion. A special venire was requested and the motion to quash for the same reasons above stated was made. It follows, of course, that for the reasons above stated the court likewise was correct in overruling this motion.

There was a plea to the jurisdiction filed in the lower court upon which testimony was heard. The allegations contained in this plea were all decided adversely to the contention of this appellant in the former opinion in this cause. For reasons therein stated it was held that the proper jurisdiction was Leake county. This is not gainsaid by the appellant here, except that he contends that the state failed to prove by its testimony on this plea that the shooting occurred in Leake county. The indictment alleged that the murder was committed in this county, and the testimony in the trial in chief showed this fact. It devolved upon the defendant to prove the allegations of this plea, and not upon the state to dis-

prove them, so the action of the court was correct in overruling this plea.

It becomes necessary here to state the principal facts relied upon by the state to sustain this verdict and judgment, and also the facts relied upon by the defendant: Some months' before the difficulty in which Owen was killed occurred, the house or premises of the defendant was searched by some officers, either state or federal, for liquor. None was found. After this Atkinson made statements or threats to the effect that he would shoot or kill any one or any officers who came searching around on his place without his permission or without a search warrant. Certain federal prohibition officers obtained information that there was a still, or some barrels containing mash or beer from which whisky is made, located on some land not a great distance from the house of this defendant. That a posse consisting of some federal prohibition agents and some county officers came upon these barrels of mash or beer along about 1 or 2 o'clock in the morning previous to the shooting. These barrels, about twelve in number, were about two hundred and fifty or three hundred yards from a road in a depression or hollow in some woods. These men, the deceased Owen being one of them, took positions at various distances from the barrels to await developments, and for the purpose of catching the persons in the act of making liquor. There were five in this posse. Just about daybreak they saw the defendant Will Atkinson, accompanied by either one or two men, come to the barrels and either look at them or, as testified to by one, put some molasses in them, and stir it in. These officers were not seen by these men at that time; and no effort was made to make any arrest then. But the officers continued their watch. The men after looking or putting molasses in the barrels left. Later on two white men, Ligon and Daughtery, went to the home of Will Atkinson and told

him they had noticed the tracks of some men leading down to the place where these barrels were, and that they were of the opinion they were officers. That this beer was the property of the defendant, and that one or both of them had been requested by him to help him do some work, probably on this beer that day. Atkinson was advised by one or both of them not to go to the beer, because he might there find these officers. The defendant Atkinson stated in effect that he would see about it, and went in his house and got two shotguns and a pistol, and asked the men there who would go with him. At this time there were present at the defendant's house, the defendant, his brother Jeff Atkinson, Ligon, and Daughtery. Jeff stated that he would go, and Will gave Jeff a double-barreled shotgun and kept for himself an automatic shotgun. That Will also gave Jeff some shells at the time. Will also put a 45-caliber pistol in his pocket. These four men then went down the road, examining the tracks. These tracks differed from the ordinary tracks around there, because the heel track appeared to have been made by a rubber heel. While they were going down the road and examining the tracks, further remonstrance was made with this defendant about his going to the beer. About the time these four men got to the place to turn off the road and go toward the beer, Ligon declined to go further, and Daughtery says that he also did not go with Jeff and Will, giving as an excuse that he was barefooted and the thorns and briers would hurt his feet. He however approached, by a different route and rather behind the two brothers, the scene of the shooting. The testimony for the state shows that Will and Jeff Atkinson were some yards from each other; that both approached the spot where the barrels were with their guns held in both hands, as one witness expresses it, as if they were shooting birds. In other words, this testimony shows that these men were both

on the alert, with their shotguns in such a position that they could quickly begin shooting if necessary. In this manner they approached the scene of the difficulty. The five officers were all several yards apart and several yards from the barrels. The testimony shows that they were all lying down just before the shooting, with the possible exception of one Williams, who was either sitting or kneeling, with his gun either in his lap or by his side. Williams seems to have been the first one who saw the Atkinsons. He states that upon looking in their direction he saw Will Atkinson just as Will leveled his gun and fired at him. That as soon as he saw Will he started to get up to defend himself, and exclaimed in effect, ''There they are, with their guns on us.'' There were two shots fired in rapid succession, and shortly thereafter quite a fusillade of shots. According to the testimony of the state both of the Atkinsons were shooting, and several of the officers. Williams testified that the first two shots fired by the two Atkinsons were fired at him. After this he saw Owen getting up from the ground with his gun in his hand; about that time shots were fired by the Atkinsons and Owen fell, exclaiming that he was shot to pieces. At the time Owen was shot he had his gun in his hand, and he never fired it. It was a hammerless shotgun, and the safety catch had not been pulled back to that the gun could be fired. The shooting lasted but a few minutes, when the Atkinsons left the scene. Owen was shot twice, and died from the effects of one of these wounds several weeks later in a hospital in Jackson, from peritonitis, a result of the wound. The shooting occurred on land belonging to the father of the appellant.

The material testimony for the defendants is about as follows: The defendant himself testified that the barrels of beer were not his, and that he did not know they were on his father's place. That at that time he was looking after his father's business, because his father

was incapicated by illness. That Ligon and Daughtery had tried to sell him some whiskey which he refused to buy. That he thought they were engaged in making liquor and had accused them of it, which they denied. That he had made no threats against revenue officers, but that there was a man in the party which searched his premises some months before, whom he disliked and who disliked him, and that he had sent this man word to come on his premises again without his permission. This man was with the posse when Owen was shot. That on the morning of the shooting Ligon and Daughtery told him that if he would come with them they would show him who was making whisky on his father's place. That Daughtery asked him to lend him a gun, and thereupon he lent Daughtery the double-barreled shotgun, and carried this automatic gun himself. That the gun he lent Daughtery was loaded with buckshot, and the gun he carried was loaded with squirrel shot. That nothing was said about tracks or revenue officers, and that he examined no tracks in the road. That his brother Jeff was not with them at all. That his purpose in going with Daughtery and Ligon was a peaceful mission, namely to ascertain and stop whoever was attempting to make liquor on his or his father's place. That when he and Daughtery, who were walking some yards apart, were within twenty or thirty yards of where the barrels were, one of the men around the barrels, unknown to him at that time, jumped up with a gun in his hand, and in effect exclaimed, "There they are; shoot them," and immediately these men began shooting, and that he shot twice in self-defense, because they were shooting at him, trying to kill him. That Daughtery also shot. That he shot both times at Williams. Owen was shot with buckshot.

From this testimony it will be seen that it was the theory of the state that the defendant, upon hearing that

revenue officers were probably down watching his barrels of beer, armed himself and brother with deadly weapons, and started out looking for the officers. That his conduct was in accordance with his threats. That he came upon these officers unexpectedly; and at once began shooting at them, aided and assisted by his brother, and that one or both of them shot Owen inflicting a fatal injury. In other words, the theory of the state is that Owen was murdered by this defendant, assisted by his brother. The theory of the defendant was that he knew nothing of the presence of these officers, but was on a peaceful mission when he was surprised by the officers opening fire on him, and that he only shot in self-defense. In other words, the theory of the state was murder, while that of the defendant was self-defense. Neither theory presented a case of shooting in the heat of passion or a theory of manslaughter.

It is unnecessary to set out in detail the testimony relating to alleged threats made by the defendant. The time of these threats is substantially fixed as being after some officers had searched his premises, which was several months before the shooting. The threats were substantially against revenue officers or people sneaking around and searching his premises. After carefully examining all of this testimony, we don't think there was any error committed by the lower court in admitting it.

This testimony comes under the general rule thus stated in 30 C. J., p. 191:

"Threats made by defendant against a class to which deceased belonged, and *prima-facie* referable to deceased although his name is not mentioned, are admissible against defendant. Thus threats against policemen, persons of a certain nationality, the members of the family, or any persons visiting a certain woman, are admissible, where deceased was a member of the class referred to."

See, also, *Sharp* v. *State,* 193 Ala. 22, 69 So. 122.

Criticism of several charges given for the state is made. We find no error in any of these charges, except the one hereafter set out. Before setting out this charge, however, we should call attention to the following charge given the state:

"The court charges the jury for the state that murder is the killing of a human being, without the authority of law by any means or in any manner, when done with a deliberate design to effect the death of the person killed. And if you believe from the evidence in this case, beyond a reasonable doubt that the defendant Will Atkinson so killed the deceased, Joseph Owen, then he is guilty of murder, and you will so find."

This instruction is a statutory definition of murder. copied from section 957, Hemingway's Code (section 1227, Code of 1906). The objectionable charge (charge No. 4 given the state), which immediately follows the statutory definition of murder, is as follows:

"The court charges the jury for the state that as a matter of law each person present, consenting to or in any wise aiding or abetting in the commission of an offense, and doing any act which is an ingredient in the crime, or immediately connected therewith, and in any wise leading to the commission thereof, becomes a principal, although he may not have actually committed the crime with his own hand or by his individual act or conduct, and if the jury believe from the evidence in this case beyond reasonable doubt that Joseph Owen was shot and killed, and that Will Atkinson and Jeff Atkinson were present at the time Owen was killed aiding, abetting, or assisting in an unlawful, willful, and felonious homicide and that either of them shot and killed Joseph Owen not in necessary self-defense, then this defendant is guilty of murder, regardless of whether or not his gun was loaded with large or small shot, or regardless of whether or not his gun was loaded with large or small

shot, or regardless of whether or not he or Jeff Atkinson fired the fatal shot.''

It is contended by the appellant that this charge is similar to that condemned by the court in the opinion in *Harper* v. *State,* 83 Miss. 402, 35 So. 572. This charge, however, is different from the one condemned in the above opinion for the reason that an offense must be committed according to the charge in the present case.

The charge, however, is erroneous in stating that the defendant is guilty of murder if he aided, abeted, or assisted in an unlawful willful, and felonious homicide. This might be manslaughter. In order to constitute murder this aiding and abetting should have been done with malice aforethought, or with the deliberate design to effect the death of the one killed, and must be done not in necessary self-defense. In other words, standing alone this charge would have authorized the jury to convict of murder without embodying a correct definition of what is murder.

After a most careful consideration, however, we have concluded that the giving of this charge is not reversible error, because no theory of manslaughter was embodied in the testimony in the case. It was either murder or an acquittal because of a justifiable homicide committed in self-defense. A correct definition of murder had previously been given in the instruction above quoted. Neither was it error for the court to refuse the defendant an instruction embodying the statutory definition of manslaughter for the reasons above assigned.

The court likewise refused the following instruction requested by the defendant:

''The court instructs the jury for the defendant that under the law of this state the killing of a human being without notice, while the deceased was engaged in the commission of any misdemeanor, or in the attempt to commit a misdemeanor, such killing will not be murder, but will be manslaughter.''

The theory of the appellant is that these people were trespassers on the land of his father which was under his supervision and control, that he had sent word to one of these men not to come on his lands again without his permission, and therefore they were trespassers under sections 1132 and 1137, Hemingway's Code (sections 1389 and 1394, Code of 1906). The reading of section 1132 will show that it is not in point. Section 1137 is not in point because, first, it was not shown that the defendant's message was ever delivered to the party who was a member of the posse; second, this message was not sent or delivered to the deceased Owen, and consequently could in no sense of the word make him a trespasser; third, it was not shown that the lands were inclosed nor within a stock-law district. Consequently there was no testimony to show a violation of either of these sections, and the court was correct in refusing this instruction.

We have only noticed in this opinion those objections which we thought were of sufficient importance to be separately considered. All objections not noticed in this opinion have received our most careful consideration, and we find no reversible error in them.

The judgment of the lower court is affirmed.

*Affirmed.*