## Brown *et al. v.* State.

(In Banc.   Jan. 7, 1935.)

[158 So. 339.   No. 31375.]

(In Banc.   April 29, 1935.)

[161 So. 465.   No. 31375.]

544

**D. P. Davis** and **Jno. A. Clark,** both of De Kalb, for appellant.

Brewer & Hewitt, of Jackson, for appellants.

548

W. D. Conn, Jr., Assistant Attorney-General, for the state.

552

Argued orally by **John A. Clark**, for appellant, and by **W. D. Conn, Jr.**, for the state.

**Cook, J.,** delivered the opinion of the court.

The appellants, Ed Brown, Henry Shields, and Yank Ellington, were convicted of murder in the circuit court of Kemper county and were sentenced to be hanged, and from this conviction and sentence this appeal was prosecuted.

Raymond Stewart lived alone in a small farm house in Kemper county. On Friday, March 30, 1934, neighbors of the said Stewart discovered him lying unconscious in a side room of his house. In this room there was a pile of cotton seed near the body, and there was an open tool chest with blood on it in this room or an adjoining hall. Blood was also sprinkled on certain parts of the wall, and there was a large stick and parts of a lamp chimney and the bowl of a lamp, covered with blood, lying on the floor. Stewart died before a doctor arrived, and upon investigation it was found that his body had been brutally beaten and bruised. There was a severe wound on the shoulder which the doctor testified could have been made with an ordinary axe or a heavy club; his collar bone was broken; his shoulder joint burst in two places; one arm was broken in several places; the skin was off his right cheek; the skull was fractured four or five times and punctured behind one ear; there was a bad cut in front of the left ear and the bones in the top of his head were crushed into small pieces. There was a perceptive odor of kerosene in the room, and a lamp wick with both ends charred and burned. A chisel and a large stick, called a "wagon standard," which were found in the room, were blood-stained. At the time the murderous assault on Mr. Stewart was committed, from which he died on March 30, 1934, the circuit court of Kemper county was in session, and the appellants were

indicted for the murder on April 4, 1934, and were placed on trial on April 6, 1934.

At the trial there was testimony to the effect that shortly after the homicide an investigation was made at the home of Henry Shields, one of the appellants, and a jumper with gray hairs and blood on the back of it was found in a bin of clothes, and partially concealed in a woodpile in the yard, there was found an axe with blood on it.

The sheriff of Kemper county was offered as a witness to testify as to confessions made in his presence by each of the appellants on Monday night following the death of the deceased on Friday. When these confessions were first offered in evidence, counsel for the appellants suggested that a preliminary examination as to their competency be conducted in the absence of the jury. Thereupon the jury was excluded, and the witness was fully examined by counsel for the state and the defendants. The witness testified that he assured each of the defendants that he would protect them from harm from outside sources, that no threats of violence were made against them, no force or intimidation used, and no hope or promise of reward or inducements of any kind held out to them; that they were repeatedly admonished to tell only the truth; and that the statements were freely and voluntarily made. The appellants cross-examined this witness but offered no evidence to contradict his testimony that the confessions were free and voluntary. On this cross-examination it was developed that the sheriff had heard rumors that the appellants had been previously whipped and had confessed, and it was further developed that Henry Shields, one of the appellants, was limping when he came into the room where the confession was made, and stated that he could not sit down for the reason that he had been strapped pretty hard. The sheriff further testified that he asked the appellants if they knew that under the law they might be hanged if

they were found guilty, and they replied that they knew that fact.

Upon this testimony the trial judge ruled that the confessions were freely and voluntarily made and were admissible, and thereupon the witness testified that each of the appellants first confessed to him separately, and that they repeated the confessions in the presence of each other and in the presence of himself, the sheriff of Lauderdale county, Eugene Stevens, a Meridian minister, and several deputy sheriffs.

With the exception of a dispute between them as to who first entered the room where the deceased was sleeping and who struck the first blow, and some minor details, the statements of the three appellants, as detailed by this witness, were substantially the same. The confession of Henry Shields was substantially as follows: That he met the appellants Brown and Ellington in the afternoon before the killing, and they informed him that they were going to kill Mr. Stewart for the purpose of securing certain money which they claimed he owed them; that each offered him twelve dollars to assist them, and he accepted the proposition; that it was agreed that they would meet at the home of Brown about midnight following, which they did; that they then discussed the proposed killing and agreed upon a plan, and then went to the house of Mr. Stewart; that he and Ellington went to the west end of the house and entered through a door leading directly into the room where Stewart was sleeping, while Brown entered at the back of the house and waited with an axe which he secured from a tool box; that Ellington entered the room first and struck Mr. Stewart the first blow with a stick; that Stewart jumped up and made his way into the hall while they lighted a lamp and followed; that Ellington struck Stewart again in the hall, and in the scuffle broke the lamp chimney; and that Ed Brown then struck him with an axe, knocking him to the floor. He further stated that Ed Brown had the key to a safe in the house, and that after Stewart

was knocked down in the hall Brown opened the safe and searched it for money, but found none; that he and Ellington carried Mr. Stewart into the cotton-seed room, and placed him on the seed; that Ed Brown then poured the oil from the lamp on the seed around the body and threw the lighted lamp wick down in an effort to burn him and the house, and they then left the premises. Shields denied throughout that he struck the deceased at all.

As detailed by the witness, Brown's statement of what occurred up to the time they entered the house was the same as that of Shields. Brown stated that he secured a foot axe from the tool chest and waited in the hall until Mr. Stewart came out of the bedroom; that Shields then hit him with an axe and he (Brown) hit him with the foot axe and knocked him down; that Shields and Ellington then carried the body into the seed room, and Shields poured the oil on the seed and attempted to set them on fire. He further stated that he threw the foot axe in a cistern or well in the yard, but this axe was not found. Both Brown and Ellington stated that Shields carried an axe to the house and into the deceased's bedroom, and both stated that he struck the deceased with the axe in the hall, while Ellington stated that Shields struck the first blow with the axe when they entered the room where the deceased was sleeping. Ellington denied striking the deceased in the bedroom, but stated that he did strike him one or two blows with a chisel after he got out near the tool chest in the hall. Both Ellington and Shields stated that Brown was a tenant on Mr. Stewart's farm, worked around the house and fed the live stock, and frequently carried a bunch of keys belonging to Mr. Stewart. Their statements covered other details in reference to an exchange of jumpers and incidental matters, which we will not here set forth. The sheriff of Lauderdale county and Eugene Stevens, a minister, also testified as to the confessions of appellants, and their version of the circumstances under which the

confessions were made, and the statements of each of the appellants were substantially the same as that of Sheriff Adcock.

With the admission of these confessions the state closed its case, and thereupon each of the appellants took the stand and testified to facts tending to establish an alibi, and also offered their wives and one other person as witnesses to establish the alibi. They admitted that they made the confessions which had been offered in evidence, but testified that prior to the time they confessed to the two sheriffs in the Lauderdale county jail they had been seriously whipped and otherwise mistreated by other parties, and had thereby been induced to confess to these parties, who warned them that they must thereafter continue to tell the same story, and that they made the subsequent confessions on account of fear of further violence. They explained their ability to construct their story, and tell the part each one took, upon the ground that they followed questions and suggestions of the parties who forced the confessions from them. They admitted that Sheriff Adcock and his associates treated them kindly and promised to protect them from harm, and that the sheriff told them they did not have to talk, and that if they made any statement they should tell only the truth about it. Two of them also admitted that during the progress of the trial, and just a short while before they took the witness stand, they had voluntarily told Sheriff Adcock that the confessions they had made to him on the previous Monday night were true.

After the three defendants had each testified, the state requested permission to reopen its case and introduce a finger print expert who had not been available at the time the state's evidence in chief had been presented. Over the objections of appellants the court permitted this witness to testify, but offered the appellants a reasonable time to secure evidence in rebuttal. They offered no such evidence and made no requests to postpone or delay the trial until such evidence could be obtained.

This witness testified that he had developed certain finger prints which were on the bowl of the lamp found near the body of the deceased, and had compared them with the appellant Brown's finger prints and they were the same.

In rebuttal three witnesses were offered for the purpose of contradicting the appellants, who had testified that when they made their first statements about the killing, many of the answers given by them were suggested by parties present; and in the course of the examination of these witnesses, it was developed that before the appellants made the first statements they had been whipped. They also testified to various statements made by the appellants when they first confessed, which were inadmissible, but upon motion of the appellants all the testimony of these witnesses were excluded, except that to the effect that they made no sugestions to appellants as to the statements to be made by them, or the answers to be given to questions asked them, and upon the suggestion of counsel for appellants the court directed the jury to disregard all the testimony of these witnesses except that part with reference to suggestions made to the appellants. No other request in reference to the testimony of these witnesses was made of the court.

The principal assignment of error urged by appellants is that the confessions were inadmissible and should have been excluded by the court. As herein previously stated, when the confessions of the appellants were first offered, the court conducted a preliminary examination to determine their competency and admissibility. At this examination the appellants cross-examined the state witness but offered no evidence whatever to contradict the witness or otherwise show that the confessions were not free and voluntary. Upon the evidence offered the court held, and we think correctly, that the confessions were shown to have been freely and voluntarily given. In the introduction of their proof, on the merits, and in

the introduction of the state's rebuttal evidence, there was testimony which strongly tended to show that the confessions were made under the influence of fear induced by threats and violence; but no motion was made to exclude the confessions. After the court ruled that the confessions were admissible, it was never thereafter called upon to pass upon their competency, and as held in the case of Loftin v. State, 150 Miss. 228, 116 So. 435, 438, wherein identically the same circumstances and situation were presented, "the court committed no error in not excluding them, in the absence of a request so to do." In the Loftin Case, supra, the court quoted, considered, and approved the rule announced in Ellis v. State, 65 Miss. 44, 3 So. 188, 7 Am. St. Rep. 634, that "after a confession has been admitted by the court, either party has a right to produce before the jury the same evidence which was submitted to the court when it was called upon to decide the question of competency, and all other facts and circumstances relevant to the confession, or affecting its weight or credit as evidence; and if it should be made to appear at this point, or any other, during the progress of the trial, that the confession was made under such circumstances as to render it incompetent as evidence, it should be excluded by the court." But it was expressly held that if a confession has been properly admitted in evidence after a preliminary examination as to its competency, no error is committed by a failure to exclude it, in the absence of a request so to do, although during the later progress of the trial it is made to appear that the confession was made under such circumstances as to render it incompetent as evidence. The Loftin case is applicable and controlling here, and in the absence of error on the part of the lower court in failing to exclude the confessions we cannot reverse upon that point.

The appellants next assign as error the action of the court in permitting the introduction of a finger print

expert as a witness after the state had closed its case in chief, and the appellants had begun the introduction of their testimony. The record shows that the testimony of this expert was not available when the state closed its case, and it was admitted with the definite understanding that the appellants would be granted a reasonable time within which to obtain witnesses to meet the testimony to be offered by this witness. The appellants made no request to postpone or continue the trial until evidence bearing upon the finger prints could be obtained, if any were available. The reopening of a case to admit further testimony is a matter that is addressed to the sound discretion of the trial court, and its action in so doing will not be reviewed in the absence of a showing of abuse of that discretion. Baird v. State, 146 Miss. 547, 112 So. 705; Morris v. State, 148 Miss. 680, 114 So. 750.

The appellants next complain of the testimony of certain rebuttal witnesses which had reference to confessions made to them as a result of alleged whippings administered to the appellants. The court sustained appellant's motion to exclude this testimony and instructed the jury to disregard it. No motion for a new trial was made after the motion to exclude was sustained. The court granted every request made of it in reference to this testimony, and therefore it cannot be held to have committed error.

Appellants next complain that instructions No. 1 and 2 for the state do not correctly define "murder," for the reason that the words "with malice aforethought" are omitted therefrom. Both of these instructions define "murder" as being the killing of a human being, without authority of law, by any means or in any manner, when done with the deliberate design to effect death of the person killed. This definition of murder is in the exact language of the statutory definition found in sec-

tion 985, Code 1930, and is correct. Atkinson v. State, 137 Miss. 42, 101 So. 490.

Appellants next complain of the refusal of two instructions requested by them, Nos. 9 and 10. Instruction No. 9 was a cautionary instruction in reference to the effect of testimony concerning finger prints and dying declarations, and no error was committed in refusing it, first, for the reason that dying declarations were in no way involved, and second, the giving of cautionary instructions is a matter addressed to the discretion of the trial judge, and the refusal of such an instruction is not reversible error. Watkins v. State, 134 Miss. 211, 98 So. 537.

Instruction No. 10, which was refused by the court, was properly refused for the reason that it was a charge on the weight to be given the evidence. There is no merit in any of the other assignments of error.

The judgment of the court below will therefore be affirmed, and Friday, February 8, 1935, is set as the date for the execution of the sentence.

Affirmed.

**Anderson, J.,** delivered a dissenting opinion.

Stewart was murdered on the thirtieth day of March, 1934. The March term of the circuit court of Kemper county was then in session. Appellants were indicted for the murder on the fifth day thereafter—the 4th of April—and the trial began and ended on the 6th day of April, the second day after the indictment. Appellants were without counsel. The court appointed John A. Clark, L. P. Spinks, J. H. Daws, and D. P. Davis, members of the Kemper County Bar, to defend them. It is stated in the briefs that Mr. Spinks was sick and unable to attend the trial, Mr. Dawes, for reasons of his own, refused to join in this appeal, leaving Messrs. Davis and Clark. It is not shown whether these four

were the only members of the Kemper County Bar or not.

Leaving out the confessions, the evidence was wholly insufficient to sustain the conviction. The evidence showed without any substantial conflict that the appellants were driven to confess their guilt by most brutal and unmerciful whippings and beatings at the hands of persons who doubtless thought they were guilty. A large part of this character of evidence was not specifically objected to by counsel representing appellants. The majority opinion holds that for that reason its competency cannot be raised on appeal.

The first witness for the state testifying to the confessions was the sheriff of the county, Adcock. He testified that the confessions took place in jail and were free and voluntary, but stated that while one of appellants was confessing another one came in who had been so badly whipped and beaten that he was unable to sit down. The other appellants saw his condition. The evidence of Adcock was objected to by appellants and the objection overruled. Whether a confession is free and voluntary is a question for the court, but before the court is justified in admitting the confession it must be shown beyond a reasonable doubt and to a moral certainty to have been free and voluntary. Ellis v. State, 65 Miss. 44, 3 So. 188, 7 Am. St. Rep. 634; Williams v. State, 72 Miss. 117, 16 So. 296; State v. Smith, 72 Miss. 420, 18 So. 482; Johnson v. State, 107 Miss. 196, 65 So. 218, 51 L. R. A. (N. S.) 1183; Fisher v. State, 145 Miss. 116, 110 So. 361. Adcock's testimony failed to meet that requirement.

Other evidence showed and, as stated, without any material conflict, that all the confessions made to the sheriff and other witnesses were forced by brutal whippings and beatings. As also stated, these confessions went in without objection by appellants' counsel. It is doubtful whether any further objection was necessary

after the testimony of Adcock was objected to. It appears that that was enough to give the court to understand that all confessions were objected to on the same ground. But, if wrong about that, should the general rule laid down in the controlling opinion govern in this case? It is a common saying that there are exceptions to all rules. If that be true, this is one case that ought to come within the exception. Wipe out these confessions, and the court would have been forced to direct a verdict of not guilty. The court had staring it in the face this incompetent testimony without which there could be no conviction. Must the lives of the appellants be taken by the law, because their counsel failed to bring to the attention of the court this incompetent evidence? Are they without remedy? To illustrate: A is indicted for the murder of B; the evidence is sufficient to show the murder by some one, but the only evidence that A was the criminal agent is purely opinion testimony; witnesses testify that in their opinion A is the guilty agent; A's counsel does not object to the testimony; there is a conviction; A is sentenced to be hanged and appeals to the Supreme Court; must he suffer death because of the failure of his counsel to object to the testimony on the ground of incompetency?

Viewing this trial as a whole, it appears to me that it is condemned by the principles laid down by the Supreme Court of the United States in the Scottsboro cases (Powell v. Alabama) 287 U. S. 45-77. 53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527. Appellants were denied due process—a fair and impartial trial. They were represented by counsel who had neither time nor opportunity to do their part. Due process requires representation by counsel, either employed by the accused or appointed by the court. The court so held in the Alabama cases (Weems v. State, 224 Ala. 524. 141 So. 215; Patterson v. State, 224 Ala. 531, 141 So. 195; Powell v. State, 224 Ala. 540, 141 So. 201), and further that

the right was denied where, on being arraigned, the accused was not asked whether he had or was able to employ counsel or wished to have counsel appointed, or whether he had friends or relatives who might assist in that regard if communicated with; that due process required a fair, orderly, and deliberate trial.

The case in a few words is this: The murder one day. Appellants indicted the fifth day thereafter. The second day after the indictment they were tried and convicted on confessions of guilt whipped and beaten out of them. Four members of the bar had been appointed to defend them; one failed to act at the trial, and one failed to join in the appeal. Those acting failed to object to the major part of the evidence of confessions. Without the confessions the evidence was wholly insufficient to convict.

In some quarters there appears to be very little regard for that provision of the Bill of Rights guaranteeing persons charged with crime from being forced to give evidence against themselves (section 26 of the Constitution). The pincers, the rack, the hose, the third degree, or their equivalent, are still in use.

## ON SUGGESTION OF ERROR.

**Smith, C. J.,** delivered the opinion of the court on suggestion of error.

The judgment herein was affirmed (158 So. 339) on a former day, and we then held that the court below committed no error in admitting in evidence the appellants' confessions, and that its error, if such it was, in admitting certain other evidence, was cured by its being thereafter excluded.

The appellants suggest that we erred in both holdings and also suggest that the judgment should be reversed for other reasons now asserted for the first time, and which will be hereinafter stated.

■ Were the confessions erroneously admitted? When the confessions were offered, the court retired the jury and heard the evidence as to their competency. The appellants introduced no evidence then, as they should have if they desired to challenge the competency of the confessions, and it appeared without conflict from the state's evidence that the confessions had been freely and voluntarily made. Consequently, the court committed no error in admitting them in evidence.

After the state closed its case on the merits, the appellants, for the first time, introduced evidence from which it appears that the confessions were not made voluntarily but were coerced. This evidence was given by the appellants themselves who were in the courtroom during the preliminary inquiry into the competency of the confessions. No request was then or thereafter made that the confessions be excluded from the evidence. We held that, in the absence of such a request, the court was under no duty to exclude the confessions, and therefore could not be held to have erred in not so doing. In so holding we followed Loftin v. State, 150 Miss. 228, 116 So. 435, which case but announced what, according to 64 C. J. 203, and 26 R. C. L. 1054, and the authorities there cited, is the rule in other jurisdictions. The appellants cite Collins v. State, 100 Miss. 435, 56 So. 527; Butler v. State, 146 Miss. 505, 112 So. 685, and Fisher v. State, 145 Miss. 116, 110 So. 361.

In Fisher's case a confession competent when admitted was afterwards made to appear incompetent, and a motion was then made to exclude it. In Butler's case the court, after stating that the evidence was insufficient to support the verdict and therefore the judgment of conviction should be reversed, then without necessity therefor proceeded to say: "We can only account for the verdict . . . on the theory that the state's witness . . . stated . . . that his father owned a large plantation and employed considerable labor in the

community, and that the defendant was a bad negro, and that he wanted to get rid of him. This statement was not objected to, nor was any motion made to exclude it, and of course we cannot consider it as error per se.'' After again stating that the evidence accounted for the verdict, the court said: ''It should have been excluded, although not objected to.'' It is hardly probable that a division of the court there intended to overrule the court's long unbroken line of decisions, beginning with Skinner v. Collier, 4 How. 396, that the incompetency of evidence not objected to was waived and that error could not thereafter be based thereon. Moreover, this rule has been enforced since Butler's case was decided, not only in Loftin's case, supra, but also in Palmer v. Fair Co., 140 Miss. 294, 105 So. 513. In Collins' case language used by counsel in an argument to the jury was held to be improper, and, while the court did say that it was the duty of the trial judge sua sponte to instruct the jury that such remarks were improper and that they in their deliberations should not be governed by any such statements, the holding was beyond the requirements of the case, for the argument was objected to when made. The duty of a court sua sponte to control the argument of counsel runs parallel in our decisions with the absence of a duty to exclude evidence not objected to. See cases cited in the Collins' opinion.

Even where the court reserves its ruling on the admissibility of evidence when objection thereto is made, and fails thereafter to rule on it, no complaint thereof can be made in the absence of a request made after the reservation for a ruling on the objection. Mallory v. Walton, 119 Miss. 396, 81 So. 113. We must decline to overrule Loftin's case and apply here a rule different from the rule applied there.

We are not here confronted with a case where the

court was not legally organized or its functions interfered with by violence or threats thereof.

■ Was the admission of certain evidence said by the appellants to have been incompetent cured by its later exclusion? We adhere to our former ruling without further discussion thereof.

The questions here raised for the first time on the suggestion of error are: (1) The failure of the court below to exclude the confessions after the introduction of evidence tending to show that they were coerced, although not requested so to do, violates sections 14 and 26 of our state Constitution. and the first section of the Fourteenth Amendment to the Federal Constitution. (2) The indictment was received and the case tried at a time when the court below had lost the power so to do. (3) The appellants were tried before the indictment was returned or the homicide committed. (4) The name of the foreman of the grand jury was not indorsed on the indictment as required by section 1198, Code of 1930. (5) The record does not disclose that the grand jurors who returned the indictment or that the petit jurors who tried the case were sworn.

■ Was section 26 of the state constitution violated by the admission of the confessions? This section, as does the common law, provides that "in all criminal prosecutions the accused . . . shall not be compelled to give evidence against himself." We will assume that the admission in evidence, over the objection of the accused, of a confession coerced by violence is forbidden by this section of the constitution. Jordan v. State, 32 Miss. 382; Whip v. State, 143 Miss. 757, 109 So. 697; but see 2 Wigmore on Evidence (2 Ed.), sec. 823. This rule against self-crimination is not an absolute immunity, but is simply a privilege, though sacred and important, of which the accused may avail himself or not at his pleasure. It may be, and is, waived unless specifically claimed. 70 C. J. 746; 4 Wigmore on Evidence

(2 Ed.), sec. 2275; 6 Jones on Evidence (2 Ed.), sec. 2489; Decell v. Lewenthal, 57 Miss. 331, 34 Am. Rep. 449; Spight v. State, 120 Miss. 752, 83 So. 84.

This record discloses no objection to the confessions on the ground of self-crimination, but, aside from that, they were competent when admitted, and, although the appellants had the right and an opportunity so to do, no request to exclude them was made after evidence tending to show their incompetency was introduced.

█ Was section 14 of the state Constitution and section 1 of the Fourteenth Amendment to the Federal Constitution violated by the admission of the confessions? These sections provide that "no person shall be deprived of life, liberty or property, except by due process of law." Immunity from self-crimination is not essential to due process of law. Twining v. New Jersey, 211 U. S. 78, 29 S. Ct. 14, 25, 53 L. Ed. 97; Snyder v. Massachusetts, 291 U. S. 97, 54 S. Ct. 330, 78 L. Ed. 674, 90 A. L. R. 575. We can add nothing to the discussion of this question that appears in the Twining case, wherein it was said: "Salutary as the principle may seem to the great majority, it cannot be ranked with the right to hearing before condemnation, the immunity from arbitrary power not acting by general laws, and the inviolability of private property. The wisdom of the exemption has never been universally assented to since the days of Bentham, many doubt it today, and it is best defended not as an unchangeable principle of universal justice, but as a law proved by experience to be expedient. See Wigmore, Ev., sec. 2251. It has no place in the jurisprudence of civilized and free countries outside the domain of the common law, and it is nowhere observed among our own people in the search for truth outside the administration of the law. It should, must, and will be rigidly observed where it is secured by specific constitutional safeguards, but there is nothing in it which gives it a sanctity above and be-

fore constitutions themselves." The opinion in that case sets forth the history of this privilege (as does Wigmore, op. cit., sec. 2250 et seq.) disclosing its comparatively modern origin and its absence from our early colonial jurisprudence.

If the appellants mean to say that the failure of the court below to exclude their confessions after the introduction of evidence tending to show their incompetency, although not requested so to do, deprived them of their life or liberty without due process of law, there can be no merit therein. That procedure was in accord with that applicable to all civil and criminal trials, recognized in all common-law jurisdictions, and did not result in arbitrarily depriving the appellants of any constitutional or common-law right. This is all that the due process clauses of the two Constitutions require. The authorities in support hereof are so numerous as to make their citation supererogatory. Moreover, if the court below had erroneously overruled a motion to exclude these confessions, its ruling would have been mere error reversible on appeal, but would not have constituted denial of due process of law. Jones v. Buffalo Creek Coal & Coke Co., 245 U. S. 328, 38 S. Ct. 121, 62 L. Ed. 325; Central Land Co. v. Laidley, 159 U. S. 103, 16 S. Ct. 80, 40 L. Ed. 91; Bonner v. Gorman, 213 U. S. 86, 29 S. Ct. 483, 53 L. Ed. 709; Corrigan v. Buckley, 271 U. S. 323, 46 S. Ct. 521, 70 L. Ed. 969; American Railway Express Co. v. Kentucky, 273 U. S. 269, 47 S. Ct. 353, 71 L. Ed. 639.

Mooney v. Holohan, 294 U. S. 103, 55 S. Ct. 340, 79 L. Ed. 791, is cited and relied on by the appellants, but its relevancy here is not apparent. There the charge was that Mooney was convicted on perjured evidence, known to be such by the prosecuting officer, who suppressed evidence, unknown to Mooney, in impeachment thereof. No charge either of perjury or the suppression of evidence is here made. On the contrary, all of the facts

as to the confessions being coerced were known to the appellants when they were offered and were provable by their own personal testimony.

When the court below received the indictment and tried the case on its merits, had it lost the power so to do? The court met in regular session on Monday, the 19th day of March, A. D. 1934, and was authorized by section 473, Code of 1930, to remain in session for twelve days. Before the expiration of this twelve days an order was duly entered on the minutes of the court in accordance with the provisions of section 732, Code of 1930, extending the term thereof for two weeks. The grand jury had been discharged, but was recalled by the court after the beginning of the extended portion of the term, returned the indictment herein, and the case was tried during the extended portion of the term. Section 732, Code of 1930, provides that "all courts, the terms of which may be continued or extended shall possess and may exercise all the powers exercisable by the same at or during the term, or terms, which may have been so continued, or extended." As we understand the appellants' contention, it is that the statute does not authorize a court to deal in any way during the extended portion of its term with any matters that were not before it prior to the extension of the term. We cannot agree with this. The purpose of the statute is to authorize the courts to extend their regular terms and to do any and all things during the extended portion thereof that they could have done prior thereto. The order extending the court's term is as follows: "It appearing to the court that the business of the court makes it advantageous and proper to extend this term of court for two weeks so that the court may be able to take care of the business now before it. It is therefore ordered that this term of court be and the same is hereby extended for two weeks, through Saturday, April 14, 1934." The appellants say that this order

limits the power of the court during the extended portion of its term to the dealing with such matters only as were before it when the order was entered. The power of the court at an extended term is fixed by the statute, and can neither be limited nor enlarged by any order of the court.

■ Were the appellants tried before the indictment was returned or the homicide committed? This contention is based solely on a manifest clerical error in the caption to the stenographer's transcript of the evidence. This caption recites that the cause came on to be heard "on the 25th day of March, 1934." That day was Sunday, and prior to the beginning of the extended portion of the term. A recital in the caption to a transcript of the evidence in a case, if in conflict with the record of the trial, does not control, and it is manifest from the record that the indictment was returned after the homicide was committed.

■ Can the appellants now complain of the failure of the foreman of the grand jury to endorse his name on the indictment? An objection to the failure of the foreman of a grand jury to endorse his name on an indictment must be made in the court below and cannot be made in this court for the first time. Pruitt v. State, 163 Miss. 47, 139 So. 861.

■ Does the record disclose that the grand and petit juries were sworn, and, if not, can the appellants' objection thereto be here considered? The transcript of the record does not contain the minutes of the court impaneling the grand jury, but the indictment recites that the grand jury was duly impaneled and sworn, as also does the order of the court, made after the grand jury was discharged, directing it to reassemble. This would seem to be sufficient evidence that the grand jury was in fact sworn, but, aside from that, no objection thereto was made in the court below, and cannot be made here for the first time. Marley v. State, 109 Miss. 717, 69

So. 210. For the same reason, the objection that the petit jury was not sworn cannot be here considered. Hill v. State, 112 Miss. 375, 73 So. 66; Cummings v. State (Miss.), 155 So. 179; sections 1193 and 3403, Code of 1930. Moreover, it does not here affirmatively appear that the grand and petit juries were not sworn. Hays v. State, 96 Miss. 153, 50 So. 557; McFarland v. State, 110 Miss. 482, 70 So. 563.

■ The appellants have filed what they designate as a motion in arrest of judgment, wherein they set forth matters said to have occurred on the trial which do not appear in the record. A motion in arrest of judgment will not lie in the Supreme Court. It reviews only the rulings of the court below complained of in an assignment of error, and in so doing is confined to an examination of the record made in the court below. It is not a court of original jurisdiction, but of appellate jurisdiction only, and therefore we cannot here examine or consider the allegations in the motion for arrest of judgment, nor the affidavits filed in support thereof.

■ Much is said in the brief of counsel for the appellants in support of the suggestion of error to the effect that these appellants are negroes and ''stood before the trial court as helpless to defend themselves as sheep in a slaughter pen.'' In justice to the court below, we must say that this charge is not even remotely supported by the record. It is based probably on things stated in ex parte affidavits in support of the motion in arrest of judgment which have no place in this discussion.

Again they say that the court below failed ''to provide counsel, in reality, to defend'' the appellants, and ''surely it is cruel folly for the state to contend, in a court of justice, that these negroes are to be bound by the strictest and most technical rules of practice and pleading—and this after their right to counsel has been effectively denied.'' No request was made of the court to continue the case, to pass it to a later day, or to grant

the appellants any further time for the preparation of their case.

The attorneys who defended the appellants in the court below are able lawyers of extensive practice, veterans of many forensic conflicts; and the record does not disclose that they consciously failed to discharge any duty they owed the appellants.

The rules of procedure here applied are technical only in the sense that all such rules are, and what the appellants request is simply that they be excepted from the procedure heretofore uniformly applied to all litigants. This we cannot do. All litigants, of every race or color, are equal at the bar of this court, and we would feel deeply humiliated if the contrary could be justly said.

Nothing herein said is intended to even remotely sanction the method by which these confessions were obtained.

The suggestion of error will be overruled, and the sentence will be executed on Thursday, the 6th day of June, 1935.

So ordered.

**Griffith, J.,** delivered a dissenting opinion on suggestion of error.

The crime with which these defendants, all ignorant negroes, are charged, was discovered about 1 o'clock p. m. on Friday, March 30, 1934. On that night one Dial, a deputy sheriff, accompanied by others, came to the home of Ellington, one of the defendants, and requested him to accompany them to the house of the deceased, and there a number of white men were gathered, who began to accuse the defendant of the crime. Upon his denial they seized him, and with the participation of the deputy they hanged him by a rope to the limb of a tree, and, having let him down, they hung him again, and when he was let down the second time, and he

still protested his innocence, he was tied to a tree and whipped, and, still declining to accede to the demands that he confess, he was finally released, and he returned with some difficulty to his home, suffering intense pain and agony. The record of the testimony shows that the signs of the rope on his neck were plainly visible during the so-called trial. A day or two thereafter the said deputy, accompanied by another, returned to the home of the said defendant and arrested him, and departed with the prisoner towards the jail in an adjoining county, but went by a route which led into the state of Alabama; and while on the way, in that state, the deputy stopped and again severely whipped the defendant, declaring that he would continue the whipping until he confessed, and the defendant then agreed to confess to such a statement as the deputy would dictate, and he did so, after which he was delivered to jail.

The other two defendants, Ed Brown and Henry Shields, were also arrested and taken to the same jail. On Sunday night, April 1, 1934, the same deputy, accompanied by a number of white men, one of whom was also an officer, and by the jailer, came to the jail, and the two last named defendants were made to strip and they were laid over chairs and their backs were cut to pieces with a leather strap with buckles on it, and they were likewise made by the said deputy definitely to understand that the whipping would be continued unless and until they confessed, and not only confessed, but confessed in every matter of detail as demanded by those present; and in this manner the defendants confessed the crime, and, as the whippings progressed and were repeated, they changed or adjusted their confession in all particulars of detail so as to conform to the demands of their torturers. When the confessions had been obtained in the exact form and contents as desired by the mob, they left with the parting admonition and warning that, if the defendants changed their story at

any time in any respect from that last stated, the perpetrators of the outrage would administer the same or equally effective treatment.

Further details of the brutal treatment to which these helpless prisoners were subjected need not be pursued. It is sufficient to say that in pertinent respects the transcript reads more like pages torn from some mediaeval account than a record made within the confines of a modern civilization which aspires to an enlightened constitutional government.

All this having been accomplished, on the next day, that is, on Monday, April 2, when the defendants had been given time to recuperate somewhat from the tortures to which they had been subjected, the two sheriffs, one of the county where the crime was committed, and the other of the county of the jail in which the prisoners were confined, came to the jail, accompanied by eight other persons, some of them deputies, there to hear the free and voluntary confession of these miserable and abject defendants. The sheriff of the county of the crime admitted that he had heard of the whipping, but averred that he had no personal knowledge of it. He admitted that one of the defendants, when brought before him to confess, was limping and did not sit down, and that this particular defendant then and there stated that he had been strapped so severely that he could not sit down, and, as already stated, the signs of the rope on the neck of another of the defendants was plainly visible to all. Nevertheless the solemn farce of hearing the free and voluntary confessions was gone through with, and these two sheriffs and one other person then present were the three witnesses used in court to establish the so-called confessions, which were received by the court and admitted in evidence over the objections of the defendants duly entered of record as each of the said three witnesses delivered their alleged testimony. There was thus enough before the court

when these confessions were first offered to make known to the court that they were not, beyond all reasonable doubt, free and voluntary; and the failure of the court then to exclude the confessions is sufficient to reverse the judgment, under every rule of procedure that has heretofore been prescribed, and hence it was not necessary subsequently to renew the objections by motion or otherwise.

The spurious confessions having been obtained—and the farce last mentioned having been gone through with on Monday, April 2d—the court, then in session, on the following day, Tuesday, April 3, 1934, ordered the grand jury to reassemble on the succeeding day, April 4, 1934, at 9 o'clock, and on the morning of the day last mentioned the grand jury returned an indictment against the defendants for murder. Late that afternoon the defendants were brought from the jail in the adjoining county and arraigned, when one or more of them offered to plead guilty, which the court declined to accept, and, upon inquiry whether they had or desired counsel, they stated that they had none, and did not suppose that counsel could be of any assistance to them. The court thereupon appointed counsel, and set the case for trial for the following morning at 9 o'clock, and the defendants were returned to the jail in the adjoining county about thirty miles away.

The defendants were brought to the courthouse of the county on the following morning, April 5th, and the so-called trial was opened, and was concluded on the next day, April 6, 1934, and resulted in a pretended conviction with death sentences. The evidence upon which the conviction was obtained was the so-called confessions. Without this evidence, a peremptory instruction to find for the defendants would have been inescapable. The defendants were put on the stand, and by their testimony the facts and the details thereof as to the manner by which the confessions were extorted from them

was fully developed, and it is further disclosed by the record that the same deputy, Dial, under whose guiding hand and active participation the tortures to coerce the confessions were administered, was actively in the performance of the supposed duties of a court deputy in the courthouse and in the presence of the prisoners during what is denominated, in complimentary terms, the trial of these defendants. This deputy was put on the stand by the state in rebuttal, and admitted the whippings. It is interesting to note that in his testimony with reference to the whipping of the defendant Ellington, and in response to the inquiry as to how severely he was whipped, the deputy stated, "Not too much for a negro; not as much as I would have done if it were left to me." Two others who had participated in these whippings were introduced and admitted it—not a single witness was introduced who denied it. The facts are not only undisputed, they are admitted, and admitted to have been done by officers of the state, in conjunction with other participants, and all this was definitely well known to everybody connected with the trial, and during the trial, including the state's prosecuting attorney and the trial judge presiding.

We have already mentioned that counsel were appointed on the afternoon before the trial opened on the following morning, and that in the meantime the prisoners had been taken away to an adjoining county. Counsel were thus precipitated into the case and into the trial without opportunity of preparation either as to the facts or the law. Powell v. Alabama, 287 U. S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 165, 84 A. L. R. 527. Without having had opportunity to prepare, they assumed—erroneously as the majority now say—that the objections interposed when the so-called confessions were being introduced in chief were technically sufficient, and did not later move to exclude them when, under the undisputed testimony and the admissions of the state itself, it was fully de-

veloped that the confessions had been coerced, and that they were not receivable as evidence; and now the case of Loftin v. State, 150 Miss. 228, 116 So. 435, is seized upon as a means of sanctioning the appalling, violation of fundamental constitutional rights openly disclosed by this record, undisputed and admitted.

The case of Loftin v. State, when carefully examined, is not the case now before us, and ought not to be forced into service under the facts now being considered. No officer of the state had any part in the confessions in that case, the prosecuting officer of the state did not use the confession, knowing it was coerced, the weight of the testimony was that the confession was actually and in fact voluntary. The case now before us is thus separated from the Loftin Case, in vital principle, as far as the east from the west. ‹ The case which is applicable and ought to be controlling here is Fisher v. State, 145 Miss. 116, 110 So. 361, 365. There the alleged confession was obtained in the jail by torture in the presence of the sheriff. Defendant's counsel did not object as he should have done under the rules of procedure when the confession was offered and admitted, but later and out of time moved to exclude. The conviction was sought to be maintained, as in the case now before us, on the ground that the defendant had not raised or interposed his objection to the alleged confession in the manner required by the procedural law. In reversing the sentence this court in banc said: "Coercing the supposed state's criminals into confessions and using such confessions so coerced from them against them in trials has been the curse of all countries. It was the chief iniquity, the crowning infamy of the Star Chamber, and the Inquisition, and other similar institutions. The Constitution recognized the evils that lay behind these practices and prohibited them in this country. . . . The duty of maintaining constitutional rights of a person on trial for his life rises above mere rules of procedure, and

wherever the court is clearly satisfied that such violations exist, it will refuse to sanction such violations and will apply the corrective." See, also, People v. Winchester, 352 Ill. 237, 245, 185 N. E. 580; State v. Griffin, 129 S. C. 200, 124 S. E. 81, 35 A. L. R. 1227; Williams v. U. S. (C. C. A.), 66 F. (2d) 868; Booth v. U. S. (C. C. A.), 57 F. (2d) 192, 197; Addis v. U. S. (C. C. A.), 62 F. (2d) 329; Commonwealth v. Belenski, 276 Mass. 35, 176 N. E. 501; Mack v. State, 203 Ind. 355, 180 N. E. 279, 83 A. L. R. 1349; Hagood v. Commonwealth, 157 Va. 918, 162 S. E. 10, 601; State v. Hester, 137 S. C. 145, 162, 134 S. E. 885; O'Steen v. State, 92 Fla. 1062, 1075, 111 So. 725; People v. Brott, 163 Mich. 150, 128 N. W. 236; People v. Bartley, 12 Cal. App. 773, 108 P. 868, 870; State v. Frost, 134 Wash. 48, 50, 234 P. 1021.

To my mind it would be as becoming a court to say that a lynching party has become legitimate and legal because the victim, while being hung by the mob, did not object in the proper form of words at precisely the proper stage of the proceedings. In my judgment there is no proper form of words, nor any proper stage of the proceedings in any such case as the record of the so-called trial now before us discloses; it was never a legitimate proceedings from beginning to end; it was never anything but a fictitious continuation of the mob which originally instituted and engaged in the admitted tortures. If this judgment be affirmed by the federal Supreme Court, it will be the first in the history of that court wherein there was allowed to stand a conviction based solely upon testimony coerced by the barbarities of executive officers of the state, known to the prosecuting officers of the state as having been so coerced, when the testimony was introduced, and fully shown in all its nakedness to the trial judge before he closed the case and submitted it to the jury, and when all this is not only undisputed, but is expressly and openly admitted. Cf. Mooney v. Holohan, 294 U. S. 103, 55 S. Ct.

340, 79 L. Ed. 791. The Scottsboro Cases[1] are models of correct constitutional procedure as compared with this now before the court. In fundamental respects, it is no better than the case reviewed in Moore v. Dempsey, 261 U. S. 86, 43 S. Ct. 265, 67 L. Ed. 543, wherein the formal court procedure was without defect, but the judgment was vitiated by the substance of what actually lay behind it.

It may be that in a rarely occasional case which arouses the flaming indignation of a whole community, as was the case here, we shall continue yet for a long time to have outbreaks of the mob or resorts to its methods. But, if mobs and mob methods must be, it would be better than their existence and their methods shall be kept wholly separate from the courts; that there shall be no blending of the devices of the mob and of the proceedings of the courts; that what the mob has so nearly completed let them finish; and that no court shall by adoption give legitimacy to any of the works of the mob, nor cover by the frills and furbelows of a pretended legal trial the body of that which in fact is the product of the mob, and then, by closing the eyes to actualities, complacently adjudicate that the law of the land has been observed and preserved.

**Anderson, J.,** concurs in this dissent.

[1]See Patterson v. State, 224 Ala. 531, 141 So. 195; Powell v. State, 224 Ala. 540, 141 So. 201; Weems v. State, 224 Ala. 524, 141 So. 215; reversed Powell v. Alabama, 287 U. S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527; Norris v. State (Ala. Sup.), 156 So. 556; reversed 55 S. Ct. 579, 79 L. Ed. 1074; Patterson v. State (Ala. Sup.), 156 So. 567, reversed 55 S. Ct. 575, 79 L. Ed. 1082.